UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                                          :

SECURITIES AND EXCHANGE COMMISSION,    :

                                       :

            Plaintiff,                   :

                                       :

            -against-                   :

                                       :      **DECISION AND**

JONAH ENGLER a/k/a JONAH ENGLER-     :      **ORDER**

SILBERMAN, JOSHUA W. TURNEY, HECTOR   :      1:20-cv-1625 (DG)(PK)

PEREZ a/k/a BRUCE JOHNSON, and          :

BARBARA DESIDERIO,                   :

                                       :

            Defendants.               :

                                       :

----------------------------------------------------------------- X

**Peggy Kuo, United States Magistrate Judge:**

       The Securities and Exchange Commission ("Plaintiff" or "SEC") brought this civil enforcement action against Jonah Engler, Barbara Desiderio, Hector Perez, and Joshua W. Turney (collectively, "Defendants"), alleging that Engler, Turney, and Perez violated Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(1) & (3); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b); and SEC Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) & (c); and that Desiderio aided and abetted Engler, Turney and Perez's violations.  (Compl. ¶ 6, Dkt. 1.)

       Following entries of partial judgments on consent in favor of Plaintiff against Defendants Desiderio and Engler (collectively, the "consent judgments") (*see* "Desiderio Judgment," Dkt. 30; "Engler Judgment," Dkt. 54), the SEC now moves for an order requiring Desiderio and Engler to pay disgorgement, prejudgment interest, and civil monetary penalties.  (*See* "Pl. Motion Desiderio," Dkt. 57; "Pl. Motion Engler," Dkt. 56 (collectively, the "Motions").)  Plaintiff also requests that Engler be

precluded from offering any statement in opposition to its Motion based on his lack of cooperation throughout discovery.  ("Pl. Mem. of Law Engler" at 2, Dkt. 62.)

For the following reasons, the SEC's Motions are granted as set forth below.

## FACTUAL BACKGROUND

### I.    Defendants and Global Arena Capital Corporation

Engler, Turney and Perez worked together as registered representatives at HFP Capital Markets L.L.C. ("HFP") until they were terminated on approximately October 17, 2013.[1]  (Compl. ¶¶ 19-20, 22.)

Global Arena Capital Corporation ("Global") is a New York limited liability company that operated as a broker-dealer from 1986 to 2016.  (*Id.* ¶ 17.)

On October 23, 2013, Engler reached an agreement with Global's holding company to open and run an Office of Supervisory Jurisdiction ("OSJ") branch of Global on Sixth Avenue (the "Sixth Avenue Office") and introduced Desiderio to act as an OSJ principal.  (*Id.* ¶¶ 23-24.)  The next day, Engler and Desiderio opened the Sixth Avenue Branch, and a few days later, Turney and Perez began working for Global as registered representatives.  (*Id.* ¶¶ 25-26.)

Desiderio nominally served as the branch supervisor for the Sixth Avenue Office, but Engler ran its operations.  (*Id.* ¶ 27.)  He gave orders, controlled hiring and firing of registered representatives, allocated customer accounts among them, set gross commission targets and had final discretion over their commissions and pay.  (*Id.* ¶¶ 28-30.)

PMC Capital L.L.C. ("PMC") is a company in which Engler held a 99.9% ownership interest and Desiderio held the remaining .01%.  (*Id.* ¶¶ 18, 35.)  On December 31, 2013, Engler and Desiderio entered into an "Amended and Restated Limited Liability Company Agreement" (the "PMC Agreement") which designated Desiderio as the managing member of PMC and required her to

---

[1] HFP is referred to in the Complaint as "Broker Dealer A."  (*See* Pl. Mem. of Law Engler at 4.)

deposit any funds from Global's business into a PMC account, with any available cash to be distributed, at Engler's discretion, to Engler and Desiderio pursuant to their ownership percentages. (*Id.* ¶¶ 34, 35, 37.)  It also required Desiderio to "manage PMC in the best economic interests of Engler" or she would forfeit her interest in PMC.  (*Id.* ¶ 38.)  Desiderio's annual compensation from PMC was set at $225,000, in addition to her salary of $125,000 per year from Global.  (*Id.* ¶ 40.)

In August 2014, PMC entered into a purchase agreement with Global's holding company, by which PMC acquired 24.9% of Global's shares and stood to acquire the remaining shares "for no additional consideration once [the Financial Industry Regulatory Authority] ('FINRA') approved the transfer of control of Global to PMC."  (*Id.* ¶¶ 43-44.)  Global then made Desiderio its director, president, CEO, treasurer, and chief compliance officer.  (*Id.* ¶ 45.)

In June 2014, FINRA commenced an investigation into Engler, Turney, and Perez based on their conduct at HFP.  (*Id.* ¶ 48.)  Unrelated to that investigation, "FINRA directed multiple investigative requests to Global from mid-2014 until approximately July 2015 . . . ."  (*Id.* ¶ 49.)  In July 2014, FINRA informed Global that it was required to monitor its registered representatives' activities pursuant to the "Taping Rule," which requires special monitoring of the telemarketing activities of a broker-dealer's registered representatives, including the tape recording of their conversations, when a certain percentage of the registered representatives previously worked at broker-dealers with a disciplinary history.  (*Id.* ¶ 50.)  Global's application for an exemption from the Taping Rule was rejected by FINRA, but Global failed to install any recording system.  (*Id.* ¶¶ 51, 53-54.)

On March 25, 2015, FINRA denied Engler's application to transfer ownership of Global to PMC.  (*Id.* ¶ 60.)

On approximately March 30, 2015, Engler met with Turney and Perez and "set aggressively high commission targets . . . in an attempt to squeeze as much cash out of customer accounts as fast as he could."  (*Id.* ¶¶ 73-74.)  Engler directed Perez to meet a $312,500 commission target for April

2015, "which Engler explained meant that Perez would have to make customer trades in principal amounts totaling $520,000 per day." (*Id.* ¶ 74.) Engler told Turney that he had to "double the amount of total commissions earned from Turney's customers' accounts." (*Id.* ¶ 75.) On April 21, 2015, Engler told Turney and Perez that they needed to further increase their commissions, and that Perez should do so by selling all of his customers' securities to generate commissions of $40,000 per day. (*Id.* ¶¶ 102-03.) Days later, Engler directed Perez to increase his monthly gross commissions to $500,000 and instructed Turney to help him. (*Id.* ¶ 105.)

At all relevant times, Global held only non-discretionary customer accounts; thus, Global's registered representatives were required to obtain approval from the customer before each trade was executed. (*Id.* ¶ 72.) "In approximately late March or early April 2015, Engler instructed Turney and Perez that, if they could not get customers to agree to the volume of trades required to meet his aggressive commission targets, to instead use sham 'call logs.'" (*Id.* ¶ 76.) Engler instructed them to leave long voicemails, which would make it appear as if they had spoken with customers and obtained authorization for the trades. (*Id.* ¶¶ 77-79.) Engler and Desiderio also "masked Turney and Perez's unauthorized trading" by enabling them to use representative codes (referred to as "rep codes") belonging to other representatives so that Turney and Perez could conduct securities business in states where they were not authorized to do so. (*Id.* ¶¶ 80-83.)

On April 16, 2015, Desiderio represented through FINRA's Central Registration Depository record that Engler had voluntarily terminated his association with Global. (*Id.* ¶ 63.) However, Engler continued to control Global until June 2015. (*Id.* ¶ 64.)

On April 17, 2015, Representative A left Global. (*Id.* ¶ 85.) Although Desiderio was aware of his departure, she did not notify FINRA until May 6, 2015. (*Id.* ¶¶ 85-86, 88.) During that time, Engler instructed Turney, using Representative A's rep code, to sell everything in Representative A's accounts and buy new positions even though the customers had not authorized these transactions.

(*Id.* ¶¶ 91-92.)   Desiderio moved 66 customer accounts, in which Perez had been conducting unauthorized trading using a different representative's rep code, to Representative A's rep code.  (*Id.* ¶¶ 97-98.)  Turney and Perez made approximately 1,490 unauthorized trades using Representative A's rep code.  (*Id.* ¶ 99.)

When Representative A's rep code could no longer be used, Engler offered money to other registered representatives in exchange for the use of their rep codes so Turney and Perez could continue trading in the accounts of customers residing in states where they could not trade.  (*Id.* ¶ 109.) Representative B agreed, and Desiderio moved 150 customer accounts to Representative B's rep code at Engler's direction.  (*Id.* ¶¶ 110-12.)  When Representative B informed Desiderio that customers were complaining about unauthorized trading in his accounts, Desiderio canceled or reduced commissions on only a portion of the trades that Turney and Perez conducted using Representative B's rep code.  (*Id.* ¶ 115.)

Desiderio attempted to conceal the unauthorized trading by creating a "sham record" to make it appear as if she had been unaware of Representative A's departure from Global until a few weeks after he had left.  (*Id.* ¶ 124.)  Specifically, she sent an email to a trade clerk claiming that Representative A's "last day" was May 6, although she knew that he had left by April 17, 2015.  (*Id.* ¶ 125.)

Between April 1, 2015 and June 4, 2015, Turney and Perez executed 4,539 unauthorized trades in approximately 360 customer accounts.  (Declaration of Hane Kim ("Kim Decl.") ¶ 16, Dkt. 59; Declaration of Jacqueline Fine ("Fine Decl.") ¶¶ 2, 3, Dkt. 61; *see* Compl. ¶ 130.)  These trades resulted in losses of $5,034,827.52 to Global's customers (Fine Decl. ¶ 11) and generated net proceeds to Global of $2,295,977.90.  (Declaration of Margaret Spillane ("Spillane Decl.") ¶ 9, Dkt. 60.)

Of the total unlawful commissions generated, Engler, "either personally or through various entities he controlled," received $1,440,683.51; Turney received $327,019.13; Perez received $137,275.26; and Desiderio received $391,000.  (*See* Compl. ¶ 142; Spillane Decl. ¶¶ 15, 17.)[2]

On June 5, 2015, Desiderio withdrew Global's registration with the SEC.  (Compl. ¶ 17; "Desiderio Opp." at 11, Dkt. 66.)  On July 20, 2015, FINRA cancelled Global's membership, and in January 2016, FINRA expelled Global from membership.  (Compl. ¶ 17.)

## II.   The Securities Investor Protection Corporation Litigation

On January 28, 2016, the Securities Investor Protection Corporation ("SIPC") initiated an emergency proceeding against Global, pursuant to the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. § 78aaa (b)(1) *et seq.* ("SIPA"), seeking a protective decree as a preliminary step toward Global's liquidation.  *See Sec. Inv. Prot. Corp. v. Global Arena Cap. Corp.*, 164 F. Supp. 3d 531, 533 (S.D.N.Y. 2016); (Trustee's Application for Order Approving Settlement ("Trustee's Application") ¶ 4, Ex. E to Declaration of Kari Parks ("Parks Decl."), Dkt. 65-5.)

On or about February 16, 2016, the District Court for the Southern District of New York granted SIPC's application, *see Sec. Inv. Prot. Corp.*, 164 F. Supp. 3d at 539, placed Global in liquidation under SIPA, appointed SIPC as Trustee to liquidate Global's assets, and removed the case to the United States Bankruptcy Court for the Southern District of New York.  (*See* Trustee's Investigatory and Final Report and Account ("Trustee's Report") ¶ 25, Ex. A to Reply Declaration of Richard G. Primoff ("Primoff Reply Decl."), Dkt. 69-1; Trustee's Application ¶ 5.)

After engaging in the claims process and an investigation of Global's business and affairs, SIPC initiated an adversary proceeding on April 5, 2017 in the Bankruptcy Court of the Southern

---

[2] The Complaint alleges that Engler received "at least $1.1 million of the $2.4 million in unlawful commissions," Turney received $281,914, Perez received $137,275, and Desiderio received $391,000.  (Compl. ¶¶ 142-45.)  Plaintiff subsequently determined the actual value of unlawful commissions attributable to each person and submitted the Declaration of Margaret Spillane in support of the Motion.  (*See* Spillane Decl. ¶ 3.)

District of New York against Desiderio, Engler, PMC, and two of Engler's other companies, CMP Capital Holdings, Inc. ("CMP") and Samsana Group, L.L.C. ("Samsana") (collectively, "SIPC Defendants") [hereinafter "SIPC Adversary Proceeding"].  (*See* Affidavit of Nathanael Kelley ("Kelley Aff.") ¶ 4, Ex. F to Parks Decl., Dkt 65-6; Trustee's Report ¶ 41; "Engler Opp." at 12, Dkt. 64.)  SIPC sought to (a) enforce the payment of three promissory notes totaling $784,000 made by Engler and Desiderio and payable to Global, and (b) set aside as fraudulent conveyances certain transfers totaling at least $7.65 million from Global directly or indirectly to the SIPC Defendants.  (Kelley Aff. ¶ 4; Trustee's Report ¶ 41.)  The action was brought pursuant to Bankruptcy Code §§ 544, 548, 550 and 551 and New York's DCL §§ 270-278.  (Trustee's Application ¶¶ 15, 19); *see Sec. Inv. Prot. Corp., as Trustee for the liquidation of Global Arena Cap. Corp. v. Desiderio*, Adv. Proc. No. 17-01049 (MEW).

On June 25, 2018, SIPC and the SIPC Defendants entered into a Settlement Agreement (Trustee's Application ¶ 10 n.2), which was approved by the Bankruptcy Court on July 20, 2018 ("the Settlement Agreement").  (*See* Order Approving Settlement Agreement, Dkt. 78; Trustee's Report ¶ 46.)[3]

As set forth in the Settlement Agreement, SIPC's complaint alleged that in the six months before Global closed, over $10 million was transferred from Global to accounts owned by the SIPC Defendants.  (Trustee's Application ¶ 16).  In twenty-five transactions in 2015, $9,659,376.70 was transferred to Desiderio's two personal checking accounts, all but $2,034 of which occurred before June 11, 2015.  (*Id.*)  After receiving the transfers, Desiderio transferred $8,757,000 in seventeen transfers to PMC's bank account between February 20, 2015 and May 29, 2015.  (*Id.*)  PMC then transferred $5,840,000 to CMP and $1,070,000 to Samsana in several transfers.  (*Id.*)  Global

---

[3] The Proposed Settlement Agreement included in the Trustee's Application for Settlement Agreement is the same as the Settlement Agreement that was ultimately approved by the Bankruptcy Court.  (*See* Order Approving Settlement Agreement at 1; Trustee's Application at 2; Oral Argument Sept. 23, 2022 Transcript ("Tr.") 28:10-29:2, Dkt. 82 .)

transferred $900,000 to the escrow account of a law firm, which were then transferred to CMP, and then to Engler as "bonus compensation." (*Id.*) CMP transferred $6,096,549 to Engler's personal account between January 12, 2015 and May 27, 2015. (*Id.*) In total, Engler received $6,096,549, his three companies retained $3,564,451, and Desiderio retained $902,000. (*Id.* ¶ 17.) In addition, the Settlement Agreement also stated that the Trustee sought to recover on the three promissory notes executed by Engler and Desiderio in September and October 2014, totaling $784,000. (*Id.* ¶ 19.)

Pursuant to the Settlement Agreement, Engler agreed to pay $2.3 million on behalf of all SIPC Defendants. (Trustee's Report ¶ 44(a); Trustee's Application ¶ 13(a).) Of the total amount, $1.1 million was to be paid upon execution of the Settlement Agreement, and the remaining amount was to be paid in six installments over a five-year period, from July 1, 2019 to October 1, 2023. (Trustee's Report ¶ 44(a); Trustee's Application ¶ 13(a).) If Engler made the first five installment payments and there was no default, the sixth would be forgiven. (Trustee's Report ¶ 45; Trustee's Application ¶ 13.) Engler also agreed to deliver a confession of judgment in the amount of $1.2 million to be held in escrow, which would be entered if Engler defaulted (less any amount he already paid). (Trustee's Report ¶ 44(b); Engler Opp. at 13; Trustee's Application ¶¶ 13(b), 13.)

Engler paid the initial $1.1 million, the first $125,000 installment in 2019, and an additional $25,000 in 2020. (Trustee's Report ¶ 57; Kelley Aff. ¶ 8; Engler Opp. at 13.) Pursuant to an agreement between Engler and SIPC, Engler was given leave to pay the remainder of the second installment, $100,000, in January 2021. However, he failed to do so. (Engler Opp. at 13-14; Kelley Aff. ¶¶ 8, 10.) Because Engler failed to make the remaining payments, SIPC requested an entry of judgment on March 4, 2021 in the sum of $1,050,000. (Kelley Aff. ¶ 16.) According to Engler, SIPC now has a lien on that amount plus post-judgment statutory interest of 9%. (Engler Opp. at 2.)

## PROCEDURAL BACKGROUND

On March 31, 2020, the SEC filed the Complaint. (Compl.)

Shortly thereafter, it filed a motion requesting the Court's approval of a partial consent judgment as to Defendant Desiderio. (Motion to Approve Partial Consent Judgment as to Defendant Desiderio, Dkt. 21.) Desiderio consented to entry of the judgment. (Dkt. 21-1.) The Court granted the motion and entered the consent judgment on July 22, 2020. (*See* Desiderio Judgment.)

On August 17, 2021, Plaintiff filed a motion requesting the Court's approval of a partial consent judgment as to Defendant Engler. (Motion to Approve Partial Consent Judgment as to Defendant Engler, Dkt. 52.) Engler consented to the entry of the judgment (Dkt. 52-1), and on September 1, 2021, the Court granted the motion and entered the judgment. (*See* Engler Judgment.)

Pursuant to the consent judgments, Desiderio and Engler agreed that (a) they will be precluded from arguing that they did not violate the securities laws as alleged in the Complaint, (b) they may not challenge the validity of the consent or the judgment, (c) solely for purposes of a motion for disgorgement and/or civil penalties, "the allegations of the Complaint shall be accepted as and deemed true by the Court," and (d) the Court may make determinations on such a motion "without regard to the standards for summary judgment." (Engler Judgment § III; Desiderio Judgment § III.)

Additionally, the judgments permanently enjoined Desiderio and Engler from engaging in future violations of the relevant securities laws and stated that upon the SEC's motion, "the Court shall determine whether it is appropriate to order disgorgement of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act . . . and Section 21(d)(3) of the Exchange Act . . . and, if so, the amount(s) of the disgorgement and/or civil penalty." (Engler Judgment §§ I, II, III; Desiderio Judgment §§ I, II, III.) Defendants further agreed that if the Court finds disgorgement appropriate, Defendants "shall pay prejudgment interest thereon, calculated from June 6, 2015, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." (Engler Judgment § III; Desiderio Judgment § III.)

On November 23, 2021, Plaintiff filed the Motions seeking disgorgement, prejudgment interest, and civil monetary penalties against Engler (Pl. Motion Engler) and Desiderio (Pl. Motion Desiderio).  Plaintiff requests that the Court order Engler to disgorge $1,440,683.51, pay $420,561.71 in prejudgment interest, and pay a $4 million civil penalty.  (Pl. Mem. of Law Engler at 2.)  It also requests that Engler be precluded from offering an affidavit in opposition to the Motion and that the Court draw an adverse inference against him.  (*Id.* at 18.)  Plaintiff requests that the Court order Desiderio to disgorge $391,000, pay $114,140 in prejudgment interest, and pay a $1 million civil penalty.  ("Pl. Mem. of Law Desiderio" at 3, Dkt. 63.)

Engler filed his opposition to Plaintiff's motion for monetary relief (Engler Opp.), and Plaintiff filed its Reply ("Pl. Reply to Engler," Dkt. 68).  Desiderio also filed her opposition to Plaintiff's motion for monetary relief (Desiderio Opp.), and Plaintiff filed its Reply ("Pl. Reply to Desiderio," Dkt. 70).  Desiderio filed a letter in response to Engler's Opposition ("Desiderio Letter," Dkt. 75), and Engler responded ("Engler Letter," Dkt. 76).

Oral argument was heard on Plaintiff's Motions on September 23, 2022.  (Minute Entry dated Sept. 23, 2022.)  The Court gave the parties leave to make supplemental filings.  (*See* Oral Argument Sept. 23, 2022 Transcript ("Tr.") 71:8-22, Dkt. 82; *see also* "Desiderio Supp.," Dkt. 79; "SEC Supp.," Dkt. 80.)

## DISCUSSION

### I.  Legal Standard

When a defendant agrees to entry of a consent judgment with the SEC and "agrees not to challenge the details of the [SEC]'s complaint, courts accept the allegations in the complaint to be true when deciding the [SEC]'s subsequent motion for monetary relief."  *SEC v. Juno Mother Earth Asset Mgmt., L.L.C.*, No. 11-CV-01778, 2014 WL 1325912, at *3 (S.D.N.Y. Mar. 31, 2014).

## II.    Adverse Inference Against Engler

In civil cases, courts may draw an adverse inference against a party who invokes his Fifth Amendment privilege "because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (citations omitted), *aff'd*, 421 F. App'x 86 (2d Cir. 2011).   An adverse inference against a party invoking the Fifth Amendment privilege "balances the equities" after the party refused to give its opponent material that it was entitled to.   *Suman*, 684 F. Supp. 2d at 387 (imposing adverse inference in context of summary judgment motion against defendants for invoking Fifth Amendment privilege and failing to give the SEC material that it was entitled to); *see, e.g.*, *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987) (precluding defendant from offering evidence in support of positions on which he declined to furnish discovery); *SEC v. Musella*, 578 F. Supp. 425, 430-31 (S.D.N.Y. 1984) (imposing adverse inference against defendants for refusing to testify during depositions or produce records to opposing party).

Plaintiff requests that an adverse inference be drawn against Engler for his failure to testify. (Pl. Mem. of Law Engler at 19.)   Engler does not oppose the SEC's request, but argues that "[e]ven where defendants are precluded from testifying due to their previous invocations of the Fifth Amendment, they are allowed to argue their case and introduce other evidence, including other witnesses, to support their claims."   (*See* Engler Opp. at 14.)

During discovery, Engler refused to testify or respond to Plaintiff's interrogatories on topics such as his control of Global from 2013 through 2015, his misuse of brokers' rep codes, and FINRA's investigation of Global.   (Pl. Mem. of Law Engler at 18-19; *see* Engler's Responses and Objections to Plaintiff's First Set of Interrogatories, Ex. 2 to Declaration of Richard G. Primoff ("Primoff Decl."), Dkt. 58-2; Engler Deposition Transcript, Ex. 3 to Primoff Decl., Dkt. 58-3.)   "[A]n adverse inference can 'be drawn in a civil case from a party's refusal to testify,' provided this is 'only one of a number of

factors to be considered by the finder of fact in assessing a penalty . . . .'" *Musella*, 578 F. Supp. 425 at 430 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977)). Because Engler failed to provide the SEC with information that it was entitled to during the discovery process, the Court will draw an adverse inference against Engler in determining what penalty, if any, to impose. *See, e.g.*, *Suman*, 684 F. Supp. 2d at 386 (noting adverse inference must be weighed with other evidence in deciding motion for summary judgment).

Plaintiff also requests that the Court preclude Engler from filing a declaration in opposition to the Motion because he refused to respond or cooperate with the SEC throughout discovery. (Pl. Mem. of Law Engler at 18.) Because Engler has not provided an affidavit in response to the Motion, Plaintiff's request that he be precluded from submitting one is moot.

## III.  Disgorgement

A district court may order that a defendant disgorge profits obtained by violating federal securities laws. *SEC v. Kelly*, 765 F. Supp. 2d 301, 324 (S.D.N.Y. 2011) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972)). Disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched." *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978). "Disgorgement . . . is designed in part to ensure that the defendant not profit from his illegal acts, a goal that is nonpunitive." *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998). "Unlike other remedies, disgorgement is not designed to compensate victims or to punish wrongdoers, but is instead meant to deter wrongdoing by 'forcing a defendant to give up the amount he was unjustly enriched." *SEC v. Fowler*, 440 F. Supp. 3d 284, 296 (S.D.N.Y. 2020) (quoting *SEC v. Cavanagh*, 445 F.3d 105, 116 n.25, 117 (2d Cir. 2006)), *aff'd as modified*, 6 F.4th 255 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 590 (2021).

"The principal issue . . . in determining the amount of disgorgement to be ordered is the amount of gain received by each defendant from the fraud." *SEC v. Opulentica, L.L.C.*, 479 F. Supp.

2d 319, 330 (S.D.N.Y. 2007) (quoting *SEC v. Inorganic Recycling Corp.*, No. 99-CV-10159 (GEL), 2002

WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002)); *see SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d

Cir. 1996) ("The primary purpose of disgorgement as a remedy for violation of the securities laws is

to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those

laws."). The SEC has the initial burden of demonstrating the amount of the defendant's illicit profits.

*Opulentica*, 479 F. Supp. 2d at 330. "The amount of disgorgement ordered need only be a reasonable

approximation of profits causally connected to the violation; any risk of uncertainty in calculating

disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v.*

*Metter*, 706 F. App'x 699, 702 (2d Cir. 2017) (citation to summary order) (quoting *First Jersey*, 101 F.3d

at 1474-75).

Once the SEC meets its burden, the burden shifts to the defendant to demonstrate that the

requested disgorgement amount "was not a reasonable approximation," for example, by showing "that

he received less than the full amount allegedly misappropriated and sought to be disgorged."

*Opulentica*, 479 F. Supp. 2d at 330 (quoting *Benson*, 657 F. Supp. at 1133 (citation omitted)).

## A. *Engler's Disgorgement*

Plaintiff requests that Engler be ordered to disgorge $1,440,683.51, which represents his share

of the brokerage commissions that were unlawfully obtained between April 1, 2015 and June 4, 2015

("the Relevant Period"). (Pl. Mem. of Law Engler at 1; Pl. Reply to Engler at 1.)[4]

Plaintiff based this disgorgement amount on its review of documents produced by Global's

clearing agent RBC Capital Markets, L.L.C. ("RBC"), bank and brokerage records produced to the

SEC, and the SEC staff members' analyses of bank records. (Spillane Decl. ¶ 3.) To "approximate

---

[4] The Court adopts Plaintiff's definition of the Relevant Period as April 1, 2015 through June 4, 2015
(*see* Pl. Mem. of Law Desiderio at 9), although the Fine, Spillane, and Kim Declarations define "the Relevant
Period" as April 1, 2015 through June 3, 2015 (Fine Decl. ¶ 2; Spillane Decl. ¶ 2; Kim Decl. ¶ 2), noting that
Turney and Perez attempted to make trades on June 4 but Desiderio did not permit them to be executed. (*See,*
*e.g.*, Fine Decl. at ¶ 2 n.1.)

Global's net proceeds from unauthorized trades," it compared Global's gross revenues to its net profits "as set out in the monthly Settlement Statements . . . and then applied this percentage to the gross commissions related to the unauthorized trades." (*Id.* ¶ 9.)  It found that "RBC paid Global approximately 94.29% of the gross revenues Global generated" during the Relevant Period, and that applying that ratio to the gross commissions associated with the unauthorized trades resulted in a total of $2,295,977.90.  (*Id.*)  To obtain the amount attributed to Engler, Plaintiff subtracted from the total: the amount of money transferred to Desiderio's account between May 15, 2015 and June 11, 2015 ($391,000), the amount of money Turney received as a result of unauthorized trades during that period ($327,019.13), and the amount Perez received ($137,275.26).  The remainder of $1,440,683.51 is attributed to Engler.  (*Id.* ¶¶ 9, 12, 14, 15.)

Engler does not dispute the SEC's calculations and recognizes that the Court must accept the allegations in the Complaint as true.  (Engler Opp. at 3.)  He argues, however, that Plaintiff's request for disgorgement should be denied in light of his agreement to pay SIPC $2.3 million pursuant to the Settlement Agreement, or at a minimum, that any disgorgement should be offset by the $1.25 million he has already paid.  (Engler Opp. at 2, 19.)  He argues that the SIPC Adversary Proceeding covered "the very same alleged conduct" as this suit, and therefore, he has already agreed to pay the money that the SEC is now requesting that he disgorge.  (*See* Engler Opp. at 15.)

The Court disagrees.  SIPC, acting as trustee, brought the SIPC Adversary Proceeding in Bankruptcy Court to enforce the payment of three promissory notes entered into by Engler and Desiderio in 2014 and to set aside numerous fraudulent conveyances under Bankruptcy Code §§ 544, 548, 550 and 551 and New York's DCL §§ 270-278.  It did not seek to enforce violations of the securities laws, as the SEC does here.  Therefore, the conduct at issue in the two proceedings is not the same.

Furthermore, while Engler argues that the money he agreed to pay under the Settlement Agreement is the same money that he is being asked to disgorge now, he fails to demonstrate that the $2.3 million he agreed to pay to resolve the SIPC Adversary Proceeding in Bankruptcy Court encompasses the same $1,440,683.51 gained through unauthorized trading during the Relevant Period. The three promissory notes at issue in the bankruptcy proceeding, totaling $784,000, were dated September and October 2014, well before the fraudulent trading that is the subject of this litigation had occurred. The fraudulent conveyances similarly involved numerous transfers of money that occurred before the Relevant Period. Of the 25 transfers totaling $9,659,376.70 from Global to Desiderio in 2015, all but $2,034 occurred before June 11, 2015, and Desiderio transferred a total of $8,757,000 in 17 transfers to PMC between February 20, 2015 and May 29, 2015. (Trustee's Application ¶ 16.) The nine transfers from PMC to CMP totaling $5,840,000 occurred between January 15, 2015 and May 22, 2015. The transfer from Global to the law firm's escrow account to Engler of $900,000 occurred on January 12, 2015. Engler has not shown that the $2.3 million settlement amount derives exclusively or even primarily from his gains through the unauthorized trading between April 1, 2015 and June 4, 2015.

As a matter of equity, there is little risk of double counting by requiring Engler to disgorge the requested amount. A large portion of the $2.3 million Engler agreed to pay in the Settlement Agreement can be attributed to transactions that clearly pre-date the Relevant Period, *i.e.,* $784,000 in unpaid promissory notes and $900,000 transferred to the escrow account in January 2015. Of the remaining $616,000, it is easily inferred that transactions in at least this amount occurred before April 1, 2015, given that nearly $10 million was transferred from Global to Desiderio to PMC to CMP and Samsana to Engler, beginning in at least January 2015 and continuing to early June 2015. In short, Engler has not shown otherwise. Thus, he fails to show that the $2.3 million he agreed to pay—or

the $1.25 million he did pay—necessarily covers the $1,440,683.51 he received as a result of the unlawful actions in this case.

The Court finds, based on the allegations in the Complaint and Plaintiff's subsequent calculations, that $1,440,683.51 is a reasonable approximation of Engler's ill-gotten gains, and the Settlement Agreement has no impact on the requested disgorgement amount. Engler is ordered to disgorge $1,440,683.51.

### B. Desiderio's Disgorgement Amount

Plaintiff requests that Desiderio be ordered to disgorge $391,000. Desiderio acknowledges that she is bound by the allegations in the Complaint (Desiderio Opp. at 29), but argues that Plaintiff "has not met its burden to show that *any* of the $391,000 received by [her] is 'derived from' unauthorized trading or churning and thus legally subject to disgorgement." (*Id.* at 2 (emphasis in original).) Desiderio contends that the requested amount was merely her salary during the Relevant Period. (*See id.* at 32.)

Desiderio further argues that the Complaint describes two conspiracies, and that she was only involved in one of them—the scheme involving the unlawful use of rep codes. With regard to that allegation, Desiderio contends that "the SEC has not established that *any* of the trades placed in the wrong registered representative's number were unauthorized" (*id.* at 2 (emphasis in original)), and that any allegations of her involvement in other illicit conduct are wholly conclusory. (*Id.* at 11.)

Desiderio also asserts that she has already paid $85,000 in settlements, which at a minimum, should be subtracted from the disgorgement amount. (*Id.* at 32-33.) Finally, Desiderio argues, and Plaintiff agrees, that she played a less substantial role in Global's operations than Engler. (*See id.* at 5-6.)

16

Plaintiff argues that "the Complaint expressly alleges that Desiderio received $391,000 in ill-gotten gains from the unauthorized trades at issue, and[] thus, this fact has been stipulated for purposes of this motion."  (Pl. Reply to Desiderio at 3 (citing *Juno*, 2014 WL 1325912, at *3).)

The Court agrees that Desiderio is bound by the $391,000 amount alleged in the Complaint. *See Juno*, 2014 WL 1325912, at *3 (ordering defendants to disgorge $1.8 million because that amount was alleged in the Complaint and "defendants acknowledged that . . . the 'allegations of the Complaint shall be accepted as and deemed true by the Court.'").  Moreover, Desiderio's suggestion that allegations in the Complaint are incorrect or overstated "violates the unambiguous terms of the consent judgment."  *Metter*, 706 F. App'x at 701-02.  "[U]nder the terms of the consent judgment, it is immaterial whether the Complaint complied with Federal Rules of Civil Procedure 8 and 9 or would have survived a motion to dismiss.  [Defendant] surrendered h[er] right to contest whether the factual allegations in the Complaint were well-pleaded when [s]he agreed to the consent judgment."  *Id.* at 702.

The Complaint unambiguously states that "Desiderio received $391,000 derived from the unlawful commissions Global received on Turney's and Perez's unauthorized trades."  (Compl. ¶ 145.) That number is supported by Plaintiff's further calculations (*see* Spillane Decl. ¶ 15) and is a reasonable approximation of Desiderios's ill-gotten gains.  Desiderio cites *SEC v. Kingdom Legacy Gen. Partner, L.L.C.*, No. 16-CV-441, 2017 WL 417093, at *2 (M.D. Fla. Jan. 31, 2017) for the proposition that conclusory allegations in the Complaint are insufficient; however, that case addressed a motion to dismiss in which the defendant had not agreed to be bound by the allegations in the complaint.

Desiderio's argument that she should not be forced to disgorge $391,000 because that amount was merely her salary as a Global employee is belied by the fact that Desiderio received $391,000 during an approximately eight-week period in 2015, despite testifying that $350,000 (plus 1.5% of

commissions) was her annual salary and was distributed monthly.  (Desiderio Transcript 60:22-61:2, 63:14-17, Ex. A to Parks Decl., Dkt. 65-1.)

Additionally, while Desiderio states that she has already paid $85,000 pursuant to settlement agreements, the settlement agreements she submitted relate to fourteen FINRA arbitration proceedings in which individual investors sought to be compensated for their losses.  Disgorgement to the SEC, on the other hand, is not meant to compensate customers' losses, but to deprive a defendant of her ill-gotten gains.  *See, e.g.*, *Fowler*, 440 F. Supp. 3d at 296; *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) ("The primary purpose of disgorgement is not to compensate victims or punish the wrongdoer, but rather 'to prevent wrongdoers from unjustly enriching themselves through violations[]' . . . ." (citation omitted)).  While "any money that a defendant returns or has returned to her . . . victims" may be deducted from the disgorgement amount, *see, e.g.*, *Fowler*, 440 F. Supp. 3d at 296, there is no indication that Desiderio *returned* money that she gained to the individual investors.  Rather, the investors sought compensation for losses that they had sustained.  *See, e.g.*, *SEC v. Nadel*, No. 11-CV-0215 (WFK)(AKT), 2016 WL 639063 (E.D.N.Y. Feb. 11, 2016) (declining to reduce disgorgement amount by payment defendants made pursuant to a promissory note that did not involve repayment of ill-gotten gains), *R&R adopted*, 206 F. Supp. 3d 782 (2016); *but see First Jersey Sec.*, 101 F.3d at 1475 (finding that "it was well within the court's discretion to give defendants credit for the $5 million paid out to reimburse victims of their frauds and to require defendants to disgorge the rest of those profits.")  Moreover, Desiderio has not shown that the settlement amounts correspond to profits she obtained from unauthorized trading that took place during the Relevant Period, [5] or whether the settlement amounts were in fact paid.  (*See* Exs. A-I to SEC Supp., Dkts. 80-1 to 80-9; Exs. 1-14 to Desiderio Supp., Dkts. 79-1 to 79-14.)

---

[5] The SEC submitted copies of nine claims that correspond to nine of the settlement agreements that Desiderio submitted.  The SEC was unable to locate the remaining claims.  (SEC Supp. at 2 n.2.)  Of the nine claims submitted, only one states that it includes trading that overlapped with the Relevant Period, but there is

Accordingly, Desiderio is ordered to disgorge $391,000.

**IV.   Prejudgment Interest**

In securities cases, "[p]rejudgment interest may be awarded on sums ordered disgorged in order to fully compensate the wronged party for actual damages suffered." *SEC v. Frohling*, 851 F.3d 132, 139 (2d Cir. 2016). Whether to impose prejudgment interest is a matter of judicial discretion. *See, e.g.*, *Haligiannis*, 470 F. Supp. 2d at 385.

Defendants agreed in the consent judgments that if disgorgement is ordered, they "shall pay prejudgment interest . . . calculated from June 6, 2015, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." (Engler Judgment § III; Desiderio Judgment § III.)

**A.  *Engler's Prejudgment Interest***

Plaintiff requests that Engler be ordered to pay $420,561.71 in prejudgment interest.

Plaintiff calculated prejudgment interest on the $1,440,683.51 disgorgement amount "using the floating interest rate used by the Internal Revenue Service to determine interest due on underpaid taxes" and beginning as of June 6, 2015—the date that Global withdrew its registration with FINRA. (Spillane Decl. ¶ 18; *see* Ex. 5 to Spillane Decl., Dkt. 60-5.)[6]  Between July 1, 2015 and September 30, 2021, the interest rate fluctuated between 3.00 and 6.00%. (*See* Ex. 5 to Spillane Decl.)  Plaintiff determined that the prejudgment interest on Engler's disgorgement amount through September 30, 2021 is $420,561.71. (Spillane Decl. ¶ 18.)

Engler does not dispute the SEC's calculation, but argues that the Court should not mandate he pay prejudgment interest because the $1.05 million lien that SIPC placed on the amount he failed

---

no information specific to the investor's losses or Desiderio's profits obtained during the Relevant Period. (*See* Ex. D to SEC Supp., Dkt. 80-4.)

[6] Plaintiff notes that the calculations encompass only full months, and therefore begin on July 1, 2015. (Spillane Decl. ¶ 18 n.9.)

to pay under the Settlement Agreement is subject to an interest rate of 9%, which is higher than that requested by the SEC.  (Engler Opp. at 19.)  Alternatively, Engler argues that he should be required to pay prejudgment interest only until the date that he made the first $1.25 million settlement payment to SIPC in June 2018 because he was denied use of those assets after that date, or at the latest, March 2021, when SIPC requested entry of Engler's confession of judgment for the money he failed to pay under the Settlement Agreement in the amount of $1.05 million.  (Engler Opp. at 20.)

As discussed above, the money that Engler paid or agreed to pay in the Settlement Agreement does not impact the amount of disgorgement.  Therefore, the prejudgment interest on disgorgement is similarly not affected by any amounts he paid or failed to pay in that litigation.  The consent judgments provide the method by which prejudgment interest is to be calculated, which was the method employed by Plaintiff.  *See, e.g.*, *SEC v. Berkey*, 374 F. Supp. 3d 355, 359 (S.D.N.Y. 2019) (imposing prejudgment interest in accordance with the method stated in the consent judgment).

Accordingly, Engler is ordered to pay $420,561.71 in prejudgment interest.

### B.  *Desiderio's Prejudgment Interest*

Plaintiff requests that Desiderio be ordered to pay $114,140.00 in prejudgment interest.

Desiderio argues that the Court should lessen the amount of prejudgment interest for the same reasons that she asserts disgorgement is inappropriate.  As stated above, the Court rejects these arguments.

Applying the IRS's interest rate from July 1, 2015 through September 30, 2021 to Desiderio's ill-gotten gains of $391,000 results in prejudgment interest in the amount of $114,140.  (Spillane Decl. ¶ 19; Ex. 6 to Spillane Decl.)  Therefore, Desiderio is ordered to pay $114,140 in prejudgment interest.

### V.  Civil Monetary Penalties

"Civil monetary penalties are authorized by the Securities Act and the Exchange Act for both deterrent and punitive purposes."  *Frohling*, 851 F.3d at 139 (citing *SEC v. Razmilovic*, 738 F.3d 14, 38-

39 (2d Cir. 2013)); *see SEC v. Madsen*, No. 17-CV-8300 (JMF), 2018 WL 5023945, at *4 (S.D.N.Y. Oct. 17, 2018) ("The purpose of such civil penalties is to achieve 'the dual goals of punishment of the individual violator and deterrence of future violations.'" (quoting *SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001))).

There are three tiers of potential civil penalties. "A first-tier penalty is appropriate for any violation; a second-tier penalty is appropriate for a violation that involves 'fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement[;]' and a third-tier penalty may be imposed if, in addition to the requirements for a second-tier penalty, the 'violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.'" *SEC v. Starkweather*, No. 19-CV-5528 (LDH)(CLP), 2021 U.S. Dist. LEXIS 207670, at *18 (E.D.N.Y. Oct. 27, 2021) (quoting 15 U.S.C. § 78u(d)(3)(B)).

From March 6, 2013 through November 2, 2015, the maximum Tier I penalty for individuals was $7,500, the maximum for Tier II was $80,000, and the maximum for Tier III was $160,000. (Pl. Mem. of Law Engler at 23-24); *see* U.S. Sec. & Exch. Comm'n, Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of Jan. 15, 2022), https://www.sec.gov/enforce/civil-penalties-inflation-adjustments (listing the applicable penalty amounts as adjusted for inflation).

Third-tier penalties are "fines of up to the higher of (1) $ 160,000 for each violation by a natural person, or (2) the defendant's "gross amount of pecuniary gain." *Berkey*, 374 F. Supp. 3d at 359 (quoting 15 U.S.C. § 78u(3)(B)(iii) (as adjusted by 17 C.F.R. § 201.10001(a))).

The statute does not define "violation," and courts have employed different methods to calculate the number of violations that occurred. *See Fowler*, 440 F. Supp. 3d at 299. Courts have looked at the number of investors defrauded, the number of fraudulent transactions, the number of statutes violated, or the number of schemes perpetrated. *See id.* (collecting cases).

Unlike disgorgement, civil penalties may not be imposed jointly and severally. *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013). However, when calculating the gross amount of pecuniary gain of an individual defendant, "where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations." *SEC v. Amerindo Inv. Advisors Inc.*, No. 05-CV-5231 (RJS), 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014), *aff'd*, 639 F. App'x 752 (2d Cir. 2016); *see, e.g., SEC v. Cole*, 661 F. App'x 52, 55 (2d Cir. 2016) (citation to summary order) (finding that "multiple defendants can 'each benefit from the same dollar of gain,' in which case each can be penalized for that gain" (citations omitted)); *SEC v. de Maison*, No. 18-2564, 2021 WL 5936385, at *3 (2d Cir. Dec. 16, 2021) (citation to summary order) (finding district court acted within its discretion in imposing civil penalty on defendant that "represented the amount of money raised from investors in the illegal offerings in which [defendant] participated' . . . ." (citation omitted)); *SEC v. Great Am. Tech., Inc.*, No. 07-CV-10694 (DC), 2010 WL 1416121, at *2 (S.D.N.Y. Apr. 8, 2010) (imposing civil penalty "equal to the scheme's pecuniary gain"); *see also SEC v. GTF Enter., Inc.*, No. 10-CV-4258 (RA), 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (attributing the same amount of gross pecuniary gain to individual defendant and his company because individual and the company "acted as one unit and mutually benefited from the fraud").

"Beyond setting maximum penalties, the statutes leave the actual amount of the penalty . . . up to the discretion of the district court." *Amerindo*, 2014 WL 2112032, at *12 (alteration in original) (citing *Razmilovic*, 738 F.3d at 38). "In exercising this discretion, courts weigh (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to

the defendant's demonstrated current and future financial condition." *Berkey*, 374 F. Supp. 3d at 360 (quoting *Amerindo*, 2014 WL 2112032, at *12 (citation omitted)).

### A. Engler's Penalty

Plaintiff requests that Engler be ordered to pay a Tier III civil penalty of $4 million. If the Court were to apply the Tier III maximum amount of $160,000 to each of Engler's violations, it could impose a maximum penalty of over $640 million based on the number of unlawful trades. (Pl. Mem. of Law Engler at 25.) Acknowledging that this amount is excessive and unlikely to be paid, the SEC instead requests a penalty of $4 million, which it argues "is reasonable and appropriate in light of the egregiousness of Engler's conduct and the substantial losses he caused his customers." (Pl. Mem. of Law Engler at 25; *see* Tr. 16:15-23.)

Engler requests that the Court decline to impose a statutory penalty. (Engler Opp. at 21.) In the alternative, he argues that the Complaint alleges that he committed only one act in violation of the securities laws—asking his employees to create sham call logs—and therefore, the Court should order no more than a penalty of $160,000. (*Id.* at 22-23.)

Engler does not dispute that if the Court were to order a statutory penalty, a Tier III level penalty is appropriate. The Complaint sufficiently establishes that Engler was involved in fraud and manipulation and that it "resulted in substantial losses or created a significant risk of substantial losses to other persons." Specifically, Engler and his associates defrauded customers in approximately 360 accounts, resulting in net losses of over $5 million. (*See* Compl. ¶¶ 1, 5; Fine Decl. ¶ 11.) As a result of the illicit trading, Engler profited substantially more than his colleagues, personally receiving $1,440,683.51. Engler's conduct is especially egregious given his position of authority over Turney and Perez, whom he counseled and directed to engage in unlawful activity, and that he was not registered with FINRA during at least some of that time. Despite Engler's arguments to the contrary, the Complaint demonstrates that he was involved in more than just the creation of sham call logs.

23

Moreover, the unlawful trading was not confined to a single incident but occurred for several weeks and was perpetrated against hundreds of victims. Finally, Engler does not put forth evidence of his financial situation, other than his statement that he was unable to pay the remainder of the money owed under the Settlement Agreement because the pandemic destroyed his plumbing business and other activities. (Tr. 25:24-26:4.)

In cases in which Tier III penalties are deemed appropriate, some courts have opted to multiple the maximum allowable penalty by the number of victimized individuals or the number of unauthorized trades. *See, e.g.*, *Fowler*, 440 F. Supp. 3d at 297, 299, 302 (ordering defendant disgorge $132,076.40 and pay civil penalty of $1,950,000—$150,000 for each of the 13 customers whose accounts defendant defrauded); *SEC v. Malik*, No. 15-CV-1025 (RJS), 2016 WL 670032, at *2 (S.D.N.Y. Feb. 9, 2016) (ordering defendant disgorge $1,005,244.70 and pay a civil fine of $2,850,000, which was the maximum allowable penalty multiplied by 19 for the 19 investors whom the defendant defrauded). Here, relying on the number of victim accounts or unauthorized trades would result in a fine so substantial that Engler would likely be unable to pay it. *See Fowler*, 6 F.4th at 265 (finding district court did not err in rejecting imposition of a per-trade penalty where resulting fine would be so substantial that defendant would not "reasonably be capable" of paying it).

Alternatively, some courts have imposed a separate penalty for each statute that was violated. *See, e.g.*, *SEC v. Shehyn*, No. 04-CV-2003 (LAP), 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010) (calculating civil penalty by multiplying maximum fine by the number of statutory violations); *SEC v. Johnson*, No. 03-CV-177 (JFK), 2006 WL 2053379, at *10 (S.D.N.Y. July 24, 2006) (awarding separate civil penalty based on defendant's four violations of securities fraud). According to the Complaint, Engler violated Sections 17(a)(1) and 3 of the Securities Act (Compl. ¶¶ 146-48); Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder (*id.* ¶¶ 149-51), which would result in a fine of $800,000 if the maximum penalty were imposed for each violation. The Court finds this method

somewhat arbitrary and that it results in too insubstantial a fine to account for the egregiousness of Engler's conduct.

The penalty of $4 million requested by Plaintiff is likewise arbitrary.

The Court finds that a fine in the amount of Engler's gross pecuniary gain best serves the goals of punishment and deterrence and is most appropriate given the facts and circumstances of this case. Engler's gross pecuniary gain is not necessarily the same as his disgorgement amount. *See de Maison*, 2021 WL 5936385 at *2 (affirming district court's imposition of $4.24 million civil penalty and $524,885 in disgorgement where "'the SEC has demonstrated that . . . [individual defendant's] illegal conduct generated proceeds of $4,240,049.30' and that a maximum fine was warranted" (citation omitted)). In *de Maison*, the defendant signed a consent judgment agreeing not to challenge the facts in the SEC's complaint, which stated that she had acted as an unregistered broker-dealer in the sales of unregistered securities. The SEC demonstrated that the defendant's illegal conduct resulted in approximately $4.2 million in sales. *Id.* at *3. Similarly, in *Great American Technologies, Inc.*, the District Court imposed a civil penalty of $2.3 million—the scheme's pecuniary gain—on the individual defendant despite that defendant having personally received less than that, an amount of at least $1 million. 2010 WL 1416121, at *2.

The scheme that Engler orchestrated resulted in proceeds of $2,295,977.90 to Global, over which Engler had control. That he chose to then distribute some of the proceeds to others simply demonstrates the degree to which he had control over Global's proceeds. *See, e.g.*, *de Maison*, 2021 WL 5936385, at *3 n.1 (finding no error in attributing all of the gross amount of proceeds of the fraud to defendant where she played a central role in perpetrating it and all of the proceeds were "at least initially, under her control"). Given the egregiousness of Engler's conduct, his leadership role regarding the unauthorized trading, the amount of customer losses, and the adverse inference, a fine

in the amount of the scheme's gross pecuniary gain, $2,295,977.90, best serves the deterrent and punitive goals of a civil penalty.

### B. Desiderio's Penalty

Plaintiff requests that Desiderio be ordered to pay a $1 million penalty.  It argues that Tier III penalties are appropriate because Desiderio "knowingly assisted Engler, Turney, and Perez to engage in a fraudulent scheme that generated approximately $5 million in customer losses . . . ."  (Pl. Mem. of Law Desiderio at 20.)  Additionally, Plaintiff argues, Desiderio defrauded not only customers but also FINRA.  (*Id.*)  Plaintiff states that the $1 million number is based on the lesser, but still egregious, nature of Desiderio's conduct and her culpability relative to the other Defendants.  (*See* Tr. 22:22-23:4, 23:8-11.)  Plaintiff also states that imposing a separate penalty for each of the more than 1,400 unauthorized trades that Turney and Perez committed using Representative A's rep code, which Desiderio facilitated by moving accounts into Representative A's rep code, could alone justify a penalty of over $200 million.  (Pl. Mem. of Law Desiderio at 21.)

Desiderio argues that the SEC has not demonstrated that she had the requisite scienter to warrant the imposition of civil penalties, and claims that she was following the advice of legal counsel.  (Desiderio Opp. at 33.)   Additionally, Desiderio states that her "decision to enter the consent agreement was informed by her poor financial condition."  (*Id.* at 34.)

The Court finds that Tier III penalties are appropriate given that Desiderio's conduct contributed to the substantial losses suffered by hundreds of customers.  Desiderio's role as an aider and abettor of securities law violations does not immunize her from the imposition of civil penalties.  *See SEC v. Dibella*, No. 04-CV-1342 (EBB), 2008 WL 6965807, at *6 (D. Conn. Mar. 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009).  Additionally, Desiderio's attempt to deny and minimize her involvement in conduct that the Complaint plainly states she committed weighs against imposing a lesser penalty.  *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (finding defendant's tendency to "blam[e] others,

including the SEC for his own conduct" and "downplaying of the violations for which he is liable" weighed in favor of imposing a civil penalty).

While Desiderio played a less prominent role in the scheme than Engler, the Complaint makes clear that she was aware of the unauthorized trading and acted knowingly in assisting in it.  (*See, e.g.*, Compl. ¶ 3 ("At Engler's direction and with Desiderio's knowledge, Turney and Perez attempted to cover up their unauthorized trading by making fake calls to their customers . . . ."); ¶ 83 ("Engler and Desiderio routinely permitted and directed registered representatives to circumvent these state-specific restrictions . . . ."); ¶¶ 111-13 ("Desiderio made or approved" account transfers to Turney and Perez despite knowing that they were trading with a representative's code who no longer worked there); ¶ 124 ("Desiderio sought to create a sham record to make it appear that she had been unaware of Representative A's departure before May 6.").)

Finally, the Court declines to consider Desiderio's financial situation in mitigation because she has not alleged any specific facts related to her finances.

In light of the considerations mentioned above regarding the alternate methods of determining the amount of the civil penalty, *see supra*, the Court finds that a penalty in the amount of Desiderio's share of the gross pecuniary gain is most appropriate.  As the Court has not drawn any adverse inference against Desiderio, and in recognition of her less prominent role in the unlawful scheme, a civil penalty of $391,000 shall be imposed on Desiderio.  *See, e.g.*, *SEC v. Ahmed*, 343 F. Supp. 3d 16, 30 (D. Conn. 2018) (finding "there is no dispute that the Court is authorized, should it so choose, to impose a civil penalty equal to the amount ordered disgorged"; and collecting cases); *SEC v. CKB168 Holdings, Ltd.*, No. 13-CV-5584 (HG), 2022 WL 3347253, at *7 (E.D.N.Y. Aug. 12, 2022) (imposing a penalty on two defendants in an amount equal to their disgorgement).

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motions are granted in accordance with the modifications stated above.  Defendant Engler is ordered to disgorge $1,440,683.51, pay prejudgment interest on this sum in the amount of $420,561.71, and pay a civil penalty of $2,295,977.90.  Defendant Desiderio is ordered to disgorge $391,000, pay prejudgment interest on this sum in the amount of $114,140, and pay a civil penalty of $391,000.

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO

United States Magistrate Judge

Dated:   Brooklyn, New York
         September 30, 2022